# WHEELING.

## HERRON, *et als. v.* CARSON, *et als.*

Submitted June 4, 1885.—Decided June 27, 1885.

1. A subsequent statute revising the whole subject-matter of a former one and evidently intended as a substitute for it, though it contains no express words to that effect, must on principles of law as well as in reason and common sense operate a repeal of the former law. (p 75.)

2. The thirty-eighth section of chapter one hundred and ninety-four of Acts of 1872–3, directing county courts in certain cases to award writs of *ad quod damnum* returnable to such county courts is repealed by the thirty eighth section of chapter fourteen of Acts of 1881, which provides that the county courts in such cases shall institute and prosecute in their names in the circuit court proceedings to ascertain the just compensation to be paid to the tenants and proprietors of lands taken for a public road. (p. 77.)

3. A county court may appoint all three of the individuals composing the court a committee to view and report upon a county-road proposed to be established. (p. 79.)

4. Though it would be more formal for such committee to return their report in writing, signed by each of the members of such committee, yet if on the return of the report of the committee it is not thus reduced to writing and signed by each member, but in lieu thereof the whole of their report containing all the details required by the statute-law is set out at length on the order-book of the county court in the form of a recital in an order of the court made on such report, this will suffice, and the court may proceed to establish the road, just as it could have done, had such more formal report signed by all the members of the committee been returned to the court. (p. 80.)

GREEN, JUDGE, furnishes the following statement of the case :

On June 6, 1881, William Herron and twelve others of Hancock county, West Virginia, presented their petition to the county court of said county, asking that court to appoint viewers " for the purpose of viewing and reporting a public road to connect the Florance and Frankfort roads, through the lands of Lucinda Carson, William Herron and Alexander Cunningham, in precinct No. 3, Clay district, in said county." This petition states, " that this road has been a traveled road open to the public for more than forty years, but it never had by any order been declared to be a public road." At the same time Thomas Peterson and twenty others filed another petition for the opening of another and rival road in said county. On the presentation of these petitions the county court of Hancock by consent of parties made an order, whereby the President of the court and the other two members of it were appointed a committee to view the proposed roads, and to that end they were ordered to meet on the proposed road on August 22, 1881, at 10 o'clock A. M.

On August 23, 1881, the said court made an order in the case, from which it appears by way of recital that said commissioners as such committee did on August 22, 1881, view said proposed roads and other routes and had them surveyed and plats made of them, returned to the court and filed ; and from all the evidence adduced, they, the committee, decided in favor of a specified route marked on the plat, which would appear to be substantially the road petitioned for by Herron and twelve others; and that they reported that it would not be necessary to take any yard, garden, orchard, or part thereof, or to injure or destroy any building, and that this road had already been open to the public and traveled for nearly forty years. This order after these recitals states, that all the parties, through whose lands this proposed road passes were present then in court, and it then proceeds thus : " None of these parties having as yet claimed or waived damages in the event of the establishment of this road as a public road, and the court having decided to undertake said work on behalf of the county and to establish this road,

the same to be twenty feet wide," (describing it by metes and bounds); and it concludes thus : " It is therefore ordered that the said road upon the said route as hereinbefore entered, be established as a public road, and the surveyor of precinct No. 3, Clay district, be directed to take the same under his control."

This order was subsequently, on December 5, 1881, set aside as defectively and improvidently made; and in lieu thereof this order was then made with recitations similar to those of the order of August 23, 1881, set aside, except that they were somewhat more general and failed to state, as the former order did, that the committee reported, that it would not be necessary to take any yard, garden, orchard, or any part thereof, or injure or destroy any building, and which then directed : " That December 17, 1881, be fixed for hearing the parties interested at a special meeting of the court to be held on that day, and that for that purpose William Herron, Andrew Carson and wife, and Alexander Cunningham be summoned to show cause against the establishment of this road and what damages, if any, they may be entitled to recover."   On that day, December 17, 1881, the order made shows, that all persons, through whose lands the proposed road passed, appeared and waived all damages, except Lucinda Carson and Andrew Carson, who appeared and filed an answer in writing denying the jurisdiction of the court ; and thereupon it was " ordered that proceedings be instituted and prosecuted by the court in its own corporate name, in the circuit court of Hancock county pursuant to law to ascertain, what will be a just compensation to said Lucinda Carson for the land proposed to be taken and any and all other damages she may be entitled to."

An appeal was taken from these proceedings of the county court of Hancock by Andrew Carson and Lucinda his wife, and Lucinda having died, it was revived in the names of her children and heirs-at-law, the Swearingens; and having been heard by the circuit court on March 3, 1882, that court reversed the proceedings of the county court because of the error of that court in its failure to appoint a day for a hearing and to cause notice to be given to the proprietors of the property to be taken or injured to show cause against the same and for other errors; and it ordered that said matters be remanded

to the said county court with directions to appoint a day for hearing and to cause notice to be given to the proprietors of the property to be taken or injured to show cause, if any they have, against the establishment of the proposed road; a judgment was rendered in favor of the appellants for the costs.

On the return of the case to the county court of Hancock, after the proprietors of the land, through which the proposed road passed, were summoned to show cause, why the proposed road should not be established, the former appellants moved the court to recommit the case to other viewers, which the court refused to do, and they took a bill of exceptions. They then asked the court to award them a writ of *ad quod damnum*, which the court refused to do, and they took a bill of exceptions. This order of the county court made May 8, 1882, thus concludes : " And it further appearing to the court, that the said parties-defendant claim damages amounting to $500.00, and the court being willing to give only $25.00 and water-privilege, which offer the defendants refuse to accept, it is hereby ordered, that proceedings be instituted and prosecuted in the circuit court of Hancock county in the name of the county court of Hancock county pursuant to law, to ascertain what will be a just compensation to the aforesaid proprietors or tenants, if any, for the land proposed to be taken." The circuit court refused to entertain these proceedings, because the county court had made no order to establish the road, and dismissed the petition of the county court therefor. The county court then, on December 5, 1882, made an order, that the road prayed for in the petition of William Herron and others be established as a public road, and that proceedings be instituted in the circuit court of Hancock county to ascertain what will be a just compensation to the owners of the land, through which said road is to pass, for the land necessarily taken, and all other damages said land owners will sustain by reason of the establishment of this road. Thereupon the following proceedings were had in the circuit court of Hancock county : On March 28, 1883, an order was entered in said court, which set out, that the county court of Hancock county had filed its petition, which had ordered the establishment of this public road, and that Andrew Carson, Mary Elizabeth Swearingen, and John Swear-

ingen, her husband, Nancy Ann Swearingen, and John
Swearingen, her husband, through whose lands this road pass-
ed, claimed compensation therefor; and the county court of Han-
cock therefore prayed, that commissioners might be appointed
to ascertain a just compensation to these land-owners for their
lands proposed to be taken.   These commissioners the court
appointed in the manner prescribed by law to ascertain what
would be a just compensation for so much of the real estate,
as is proposed to be taken, as well as for damages to the res-
idue of said real estate, beyond the peculiar benefits which
will be derived in respect to such residue.   Their report was
excepted to by these land-owners, who demanded a jury of
twelve freeholders to ascertain their damages.   After the jury
was sworn, they were by the consent of parties and by leave
of the court allowed in the custody of the sheriff to go upon
the land proposed to be taken and viewed the same and re-
turned into court, and having retired to their room they
found a verdict that $76.00 would be a just compensation for
so much of the said real estate, as was proposed to be taken,
describing it, as well as for the damages to the remainder of
said real estate beyond the peculiar benefits, which will be
derived in respect to such residue from the work to be con-
structed.

The court upon this verdict on August 25, 1883, rendered
judgment in favor of the defendants, Andrew Carson, Nancy
Ann Swearingen and John Swearingen, her husband, Mary
E. Swearingen and Andrew Swearingen, her husband, against
the county court of Hancock county, the petitioners, for their
costs and also for the sum of $76.00, the damages so ascer-
tained by the jury; and upon the payment thereof and of
the costs by the county court of Hancock, the petitioners,
said county court was to be entitled to the right of way
through the real estate proposed to be taken as aforesaid.   On
September 3, 1883, the county court of Hancock county made
an order refusing to abandon this undertaking on the motion
of these land-owners and adjudging the payments to them of
said costs and damages; and upon the payment thereof
the proper road-surveyor was ordered to take charge of
said public road and open the same for public travel.   But
this was suspended for forty-five days to afford the de-

fendants an opportunity to appeal from this order to the circuit court.    This appeal to the circuit court of Hancock county was granted by the judge of that court November 25, 1883.    On June 25, 1884, the circuit court decided : " That there was no error in the orders and proceedings had by said county court made since the former appeal from the said county court and including the final order of the county court of Hancock made September 3, 1883, complained of by the appellants ; and it therefore affirmed the order made December 5, 1882, and all the orders subsequent thereto and adjudged, that the county court of Hancock recover of the appellants their costs about this appeal expended. This order of the circuit court was suspended for sixty days on the appellants giving bond with good security before the clerk of said court in the penalty of $100.00 conditioned as required by law, that the appellants might apply for a writ of error to said judgment of the circuit court.    To this order of the circuit court of June 25, 1884, a writ of error has been awarded on the petition of John Swearingen and Nancy Swearingen, his wife, and Andrew Swearingen and Mary E. Swearingen, his wife.

*J. R. Donehoo* for plaintiffs in error.

*G. W. Caldwell* for defendants in error.

GREEN, JUDGE :

For a proper understanding of the legal questions involved in the record in this case it is necessary to give a brief history of the statute-law in Virginia and this State in reference to the establishment of public roads.    By chapter two hundred and thirty-six of the Revised Code of 1819, vol. 2, p. 233, it was provided, that, when any persons shall apply to the county court to have a new public road opened, the court shall appoint three viewers, who being sworn should view the ground and report the conveniences and inconveniences, which would result to individuals and to the public, if the public road should be opened.    On the return of the report, if the county court was of opinion, that the road should be opened, it was required to summon the proprietors and tenants of the land, through which the proposed road would pass

or their agents and then issue a writ in the nature of a writ of *ad quod damnum* summoning a jury of twelve freeholders to meet on the ground on a certain day, of which the proprietors their tenants or agents were to be notified, unless they were present in court, when the order was made.  This jury by an inquest under their hands and seals ascertained, what damages each of the proprietors and tenants would sustain by the opening of this public road.  Upon the return of this writ and inquest to the county court it determined, whether the public road should or should not be opened, adjudging costs against the applicants, if the road was not opened.  If it was determined that this public road should be opened, then it was made the duty of the court to levy on their county at its next levy to be laid the damages so found and the costs of the inquest and direct them to be paid to those respectively entitled thereto.

This act was amended afterwards particularly by the act passed February 15, 1833, (Acts 1832–4, p. 54) and by the act passed January 30, 1834, (Acts of 1833–4, p. 97.)  On March 3, 1835, an entirely new law was passed providing for opening and repairing public roads (Acts of 1834–5 p. 56;) and this act was amended by an act passed March 30, 1837, (Acts of 1836–7 p. 80) and further by an act passed March 31, 1838, (Acts of 1838 p. 90.)  I do not deem it necessary to state the contents of these several acts.  It will suffice to state the provisions of chapter fifty-two of the Code of Virginia, p. 266, showing the change which had been made.  By section six of this chapter it is provided, that when any person applied to a county court to have a public road established, the court should direct one or more of its commissioners of roads (if it had any such officers), or it might appoint three or more viewers, to view the ground and report to the court the conveniences and inconveniences, which would result as well to individuals as to the public, if such road was established, and especially whether any yard, garden, orchard or any part thereof would have to be taken. The seventh section specifies the details to be set out in this report.  By section eight it was provided, that upon this report being made, unless the court should be against establishing the road, the proprietors and tenants of the land should be sum-

moned to show cause why the road should not be established. Upon the return of such summons, if the county court had enough before it to enable it to fix upon a just compensation to the proprietors and tenants, and it did so, and they were willing to accept the same, the county court might establish the road without issuing a writ of *ad quod damnum*. Otherwise this writ was to be issued. This writ was executed very much in the manner, in which it was directed to be executed under the provisions of the Code of 1819 stated above. Upon the return of this writ and inquest the county court upon the report, inquest and other evidence, if any, determined, whether this public road should be established. See § 13, p. 268. This was necessarily changed when by the formation of this State it was provided by Article VII, § 4 of our constitution, (Code of West Virginia, p. 32) that the board of supervisors of each county shall have under their jurisdiction the establishment of public roads in the county. The abolition of the county court by this constitution necessarily required a change in the law with reference to the establishment of public roads.

Under the different constitutions of Virginia prior to that time the county courts had not only existed, but they possessed very extensive powers administering the internal public affairs of the counties, regulating roads, ferries and mills, and exercising jurisdiction in all probate matters. But they also had very extensive jurisdiction in the trial not only of civil and criminal matters but also a very large jurisdiction in the trial of chancery causes. In fact they always had had more extensive original jurisdiction than any court in Virginia. When this State was formed, by its first constitution a very small portion of this extensive jurisdiction of the county courts was transferred to the boards of supervisors and the recorders then first called into existence. They were authorized to administer the internal and police affairs of their counties and had under their control the establishment and regulation of roads, public landings, ferries and mills. But they had no jurisdiction to try any civil or criminal action, nor had they any chancery jurisdiction. In fact the board of supervisors under our first constitution hardly reached the dignity of a court, though some powers conferred on them were semi-judicial. By this first constitution (Code, p. 32)

it was expressly provided, though the power to establish and regulate roads was conferred on the boards of supervisors, and though the issuing of writs of *ad quod damnum* had always been an incident to the establishment of public roads, " that all writs of *ad quod damnum* should be issued from the circuit court."

The legislature of this State at its first session after the adoption of our first constitution passed on December 4, 1863, " an act providing for the construction and repairs of roads and bridges," (chapter 120 of Acts of 1863 p. 178.) One of the provisions inserted in this law rendered necessary by our constitution was contained in the ninth section of said chapter one hundred and twenty. It was thereby provided, that, if the board of supervisors and any proprietor did not agree as to what was a just compensation, " a writ of *ad quod damnum* should be awarded, if desired by any proprietor or tenant, or if the board of supervisor should see cause to apply for the same. Such writ should be awarded by the circuit court commanding the sheriff to summon and impanel a jury of twelve freeholders of the county not related to either party to meet on the lands of such proprietors and tenants, as may be named in the writ, at a certain place and day also therein specified, of. which notice should be given by the sheriff to such proprietors and tenants;" and by the twelfth section of this act it was provided, " that, when this jury had agreed upon its verdict or inquest, it should be signed by the jurors and returned by the sheriff together with the writ to the circuit court, which should, if satisfied it was in conformity with the law, return the same to the board of supervisors, who should determine, whether the road should be established as proposed." Some slight changes were made in this law, and it finally took the form, in which it appears in the Code of West Virginia, chapter forty-three. It provided, that the petition for the establishment of a public road instead of being addressed to the county court was to be addressed to the board of supervisors, who were thereupon required to appoint two or more viewers or a committee of their own body to view the ground and make such report, as had been previously required. See ch. 43 of Code of W. Va. § 35, p. 274. And the board of supervisors were thereupon,

if they did not then decide against establishing the road, to appoint a day for hearing the parties and have them summoned to appear then and show cause against establishing the same.  (Code, ch. 43, § 36,p. 275.)    The board of supervisors could then or at any time afterwards determine, what would be a just compensation to each of these tenants and proprietors, and if they were severally willing to accept the amount so fixed and so stated in writing, the board could thereupon determine to open such public road; but if they or any of them did not so accept the compensation paid by the board of supervisors, and it decided in favor of opening this road, the board was required to " order proceedings to be instituted and prosecuted in their corporate name before the circuit court of the county to ascertain, what will be a just compensation to such proprietor or tenant in the premises, and to lay a sufficient levy for that purpose.    After the compensation was so ascertained, it was left optional with the board of supervisors to pay the same or to abandon the proposed undertaking. (Code, ch. 43, § 38, p. 275.)   This mode of proceeding was obviously a substitute for the former mode of determining the amount of compensation by awarding to any tenant or proprietor a writ of *ad quod damnum*, which was formerly under the constitution and laws of Virginia executed and returned to the county court and afterwards to the circuit court, as before stated.

But by our constitution of 1872 the board of supervisors was abolished; and county courts were again established with jurisdiction and powers resembling those, which county courts had under the constitution and laws of Virginia prior to the formation of this State.  By Article VIII, section 27 (See Acts of 1872-3 p. 30) there was conferred upon these courts jurisdiction among other things "in all actions at law, when the amount in controversy exceeds $20.00; in all cases of *habeas corpus, mandamus, prohibition, certiorari* and in all suits in equity.    And by section 28 of Article VIII (p. 30) they had among other things "the superintendence and administration of the internal police and fiscal affairs of the county, including the establishment and regulation of roads, ways, bridges, public landings, ferries and mills with authority to levy and disburse the county levies."    An examination of

this article will show, that the county courts under this constitution as originally adopted had not only all the powers, which had formally been exercised by the board of supervisors, but very extensive judicial powers of every description, common law and equity, civil and criminal, the model for these county courts being the county courts, which had existed under the constitution and laws of Virginia at all times prior to the formation of the State of West Virginia, and to which therefore the people of this State had formerly been long accustomed.

The adoption of this constitution of course required a change in the manner of establishing public roads. The new road-law is contained in chapter one hundred and ninety-four of Acts of 1872–3, passed December 22, 1872, and the mode of establishing public county roads was set out in section 29 *et seq.*, p. 572. The mode adopted was in most respects similar to that adopted in chapter 52 of the Code of Virginia of 1849, section 6 *et seq.*, p. 267, &c., modified by the adoption of some of the provisions of chapter 43, section 35 *et seq.*, of Code of West Virginia p. 274, &c. But no provision was made for having the proposed road viewed in any case by a commissioner of the county as provided in the Code of Virginia of 1849. But the view was to be made "by two or more viewers or a committee of their own body." Section 35 of chapter 194 of Acts of 1872–3, p. 572, adopting in this respect the provisions of chapter 43 of Code of West Virginia, section 35 p. 274. The viewers being appointed by the county court instead of the board of supervisors or the committee being a committee appointed by the county court or being a committee of the body of the county court instead of the body of the board of supervisors. On the other hand when there was no agreement between the court and any tenant or proprietor as to the compensation to which he was entitled, if the road was to be established, this act of 1872–3 provided that the county court should at the insistance of such proprietor or tenant award a writ of *ad quod damnum* returnable to the county court to ascertain the just compensation of such tenant or proprietor, and after its return the county court upon the report, the inquest of the jury and other evidence should decide, whether the road should be established.

(Chapter 194, section 38 *et seq.* of Acts of 1872–3.) These provisions are substantially similar to those contained in chapter 52 of Code of Virginia of 1849 section 10 *et seq.*

But on the second Tuesday in October, 1880, an amendment was adopted to the Constitution of West Virginia (Acts of 1883, p. 189,) which, while it did not abolish the county courts, stript them of almost all powers excepting only those, which under the first Constitution of West Virginia had been conferred on the board of supervisors and upon the recorder. This very limited jurisdiction is thus defined in the first amendment (Article XIII., section 24, page 194 of Acts of 1883): "They shall have jurisdiction in all matters of probate, the appointment and qualification of personal representatives, guardians, committees, curators, and the settlement of their accounts, and in all matters relating to apprentices. They shall also, under such regulations as may be prescribed by law, have the superintendance and administration of the internal police and fiscal affairs of their counties, including the establishment and regulation of roads, ways, bridges, public landings, ferries and mills, with authority to levy and disburse the county levies." These several powers were by the first Constitution of West Virginia conferred on the board of supervisors, (Article XII., section 4), or on the recorder. (Article VII., section 6 of Code, pages 32, 33.) There was however one diversity, to which I would call attention. The fourth section of Article VII. of the first Constitution (Code, p. 32) provided expressly that "all writs of *ad quad damnum* shall issue from the circuit court." In the amendment to the Constitution of 1880, nothing is said about writs of *ad quod damnum*. It is silent as to the court from which they shall issue. But after setting out these semi-judicial duties, which under the first constitution had been performed by the board of supervisors and by the recorder, and conferring jurisdiction with reference to them on the county courts, it adds: "Such courts may exercise such other duties *not of a judicial nature* as may be prescribed by law. (Acts of 1883, p. 195.) After the passage of this amendment of the Constitution in 1880, the next Legislature on March 12, 1881, passed an act concerning roads, bridges and landings, reviving, amending and re-enacting chapter forty-

three of the Code; and by it the proceedings for the establishment of public roads were the same as those provided in the Code, except that the tribunal, before whom these proceedings were had, and which was authorized to establish public roads, was in accordance with the amendment of 1880, the county court instead of the board of supervisors. With this exception the mode of proceeding was almost identical with that prescribed by chapter forty-three of the Code. This act in chapter fourteen of the Acts of 1881, p. 152. (See especially section 35, *et seq.,* p. 162, &c., and section 38, p 163.) Instead of directing the awarding of a writ of *ad quod damnum*, where the county court and the proprietors might not agree as to what was a just compensation, it provided: "That the county court should order proceedings to be instituted and prosecuted in its corporate name in the circuit court of the county pursuant to the forty-second chapter of the Code, to ascertain what will be a just compensation to such proprietor or tenant for the land proposed to be taken; but that when such compensation shall be so ascertained, it shall be at the option of the county court to pay the same, or to abandon the proposed undertaking; and if it decide to pay the same, it shall lay a sufficient levy for the purpose as provided for in chapter thirty-nine of the Code." This provision is identical with the first part of section thirty-eight of chapter forty-three of the Code, except that the county court is now substituted for the board of supervisors.

The last section of this chapter fourteen of Acts of 1881 is as follows: "All acts and parts of acts coming within the purview of this chapter and inconsistent therewith are hereby repealed, except the act passed December 20, 1873, entitled ' an act providing an alternative method of constructing and keeping in repair county roads,' an act amendatory and in aid thereof, shall not in any wise be affected by this act." Acts of 1881, p. 167. Did this chapter fourteen of Acts of 1881 operate a repeal of section thirty-eight *et seq.* of chapter one hundred and ninety-four of Acts of 1872–3, which provided that where " the compensation to be paid to any proprietor or tenant is not fixed by an agreement, the county court shall award a writ of *ad quod damnum* if desired by any proprietor or tenant," and directing the mode of proceeding un-

der this writ and the action of the county court upon its return to the court with the inquest of the jury of twelve freeholders? It is insisted by the counsel for the defendants in error, that it did, and by the counsel for the plaintiff in error, that it did not.

Upon the hearing of this case by the county court on June 5, 1882, the defendants by their counsel moved the court to award a writ *ad quod damnum* to issue from the county court returnable to it pursuant to this thirty-eighth section of chapter one hundred and ninety-four of Acts of 1872-3. The court overruled the motion and refused to award the writ ordering in lieu thereof, that proceedings should be instituted and prosecuted in the name of the county court of Hancock in the circuit court of said county to ascertain, what would be a just compensation to these tenants and proprietors pursuant to the thirty-eighth section of chapter fourteen of Acts of 1881. The county court obviously regarding this chapter fourteen of Acts of 1881 as repealing chapter one hundred and ninety-four of Acts of 1872-3, or at least as repealing the thirty-eighth section of this act, which directed the county court to award said writ of *ad quod damnum*. Did the county court err in this conclusion?

It is true, that a statute general in its terms and without negative words will not be construed to repeal by implication the particular provisions of a former statute, which are special in their application to a particular case or class of cases, unless their repugnancy be so glaring and irreconcilable as to indicate the legislative intent to repeal. (*Railroad Co.* v. *Hoard*, 16 W. Va. 270;) and a construction of a statute, which repeals former statutes or laws by implication and changes long approved remedies, is not favored by the courts. (*Farqueran* v. *Donnally*, 7 W. Va. 115, syl. 8.) But a subsequent statute, revising the whole subject-matter of a former one and evidently intended as a substitute for it, though it contains no express words to that effect, must on principles of law as well as in reason and common-sense operate to repeal the former. This was held in *Trustees of Philip's Academy* v. *King, Executor*, 12 Mass. 545. Following this principle the court in the case of *King* v. *Carter*, 4 Burr. 2026 decided, that a former statute which inflicted a penalty

of £100 and three months imprisonment on persons enticing away artificers, was virtually repealed by a subsequent statute inflicting £500 penalty and twelve months imprisonment for the same offence.   The same principle was acted on in *The King* v. *Davis*, 1 Leache Cr. L. 306.

So in *Nichols* v. *Squire*, 22 Mass. 168, (5 Pick.) it was decided, that the statute of 1785, chapter twenty-four respecting lotteries was repealed by statute of 1817, chapter one hundred and ninety-one, as the latter covered the whole subject-matter of the former statute.   By the statute of 1817 the selling of tickets in any lottery not granted or permitted by the Commonwealth was prohibited under severe penalty ; and when the legislature imposes a second penalty for an offence, whether that penalty is smaller or larger than the former one, a party can not be allowed to recover one or the other at his option.

The same principle was acted on by the Supreme Court of the United States in *Morris* v. *Crocker et al.*, 13 How. 210, (54 U. S. 429), where it was held, that the fourth section of the act of Congress of February 12, 1793, entitled " An act respecting fugitives escaping from justice and persons escaping from the service of their masters," is repealed, so far as relates to the penalty, by act of Congress of September 18, 1850, entitled " An act to amend and supplementary to the above act."   This conclusion is based on this ground, to use the language of the court: " The recent statute covers every offence found in the former act, which subjects the offender to a penalty of $500.00 and prescribes a new and different penalty recoverable by indictment."   The principles deducible from the Massachusetts cases and followed in these old English cases and acted upon in this case by the Supreme Court of the United States, it seems to me, must govern in determining the question which I am now discussing, rather than the principles laid down in the West Virginia cases above cited, which seem to me, to be inapplicable to the question under consideration.   The principle, which, it seems to me, must govern in determining the question I am considering, is expressed in the case of the *Trustees of Philips' Academy* v. *King, Executor*, quoted above.   This seems to me obvious, when we bear in mind, that chapter forty-three of

the Code of 1868 covered the whole subject-matter, it being the only law then in force ; and chapter fourteen of the Acts of 1881 simply revised, amended and re-enacted it slightly changing certain sections when necessary to do so by reason of the amendment to our constitution of 1880. And as chapter forty-three covered the whole subject, of course chapter fourteen of the Acts of 1881 likewise covered the whole subject. Now as chapter one hundred and ninety-four of the Acts of 1872–3 also covered the whole matter and was upon its enactment the entire law in force with reference thereto, it being a substitute for chapter forty-three of the Code, which had become obsolete by reason of the abolition of the board of supervisors and the creation of the county court, it must therefore follow, that chapter fourteen of the Acts of 1881 must have been intended by the legislature as a substitute for chapter one hundred and ninety-four of Acts of 1872–3, although this last act does not say so expressly, and therefore upon the principles of law, which I have laid down, and which are recognized in the cases above cited as well as in reason and common-sense, chapter fourteen of the Acts of 1881 must operate a repeal of chapter one hundred and ninety-four of Acts of 1872–3 and especially must section thirty-eight of said chapter fourteen substantially the same as what was section thirty-eight of chapter forty-three of the Code of 1868, operate a repeal of section thirty-eight of chapter one hundred and ninety-four of Acts of 1872-3. This section thirty-eight of chapter fourteen of Acts of 1881 provides :

"If the compensation to be paid to any tenant or proprietor be not fixed by agreement the county court shall order proceedings to be instituted and prosecuted in the circuit court of the county pursuant to the forty-second chapter of the Code of West Virginia to ascertain what will be a just compensation to such proprietor or tenant for the lands proposed to be taken."

This for the reasons, which I have stated, was evidently intended as a substitute for the thirty-eighth section of chapter one hundred and ninety-four of Acts of 1872–3, which provides, that, if the compensation to be paid to any proprietor or tenant be not fixed by agreement, the county

court should award a writ of *ad quod damnum*, if demanded by any proprietor or tenant, or if the court see cause for awarding the same. These proceedings in the circuit court under chapter forty-two of the Code thus substituted for the writ of *ad quod damnum* to be issued by the county court by chapter fourteen of Acts of 1881 were, when this substitution was made, March 12, 1881, substantially the same in its mode of ascertaining the compensation of the proprietors, as that which had existed in Virginia and in this State up to the passage of our Code of 1868. In other words it was substantially the same, as that which existed, when a writ of *ad quod damnum* was issued. It is true, that these proceedings under chapter forty-two of the Code had, when the Code was enacted, been materially different from the proceedings under a writ of *ad quod damnum*. But only seventeen days before the passage of chapter fourteen of Acts of 1881, chapter forty-two of the Code, under which these substituted proceedings in the circuit court were to be had in lieu of the writ of *ad quod damnum*, had been amended by what is called by some blunder chapter eighteen of Acts of 1881, the act having been passed seventeen days before the act called chapter fourteen. This chapter eighteen of Acts of 1881 provides by its seventeenth section:

"Either party may demand, that the question of compensation to be paid shall be ascertained by a jury of twelve freeholders selected and empaneled for the purpose."

This provision was not originally in chapter forty-two of the Code. It became necessary to insert it because section nine of Article III. of the Constitution of 1872 provided "that when required by either of the parties such compensation shall be ascertained by an impartial jury of twelve freeholders." After section seventeen of Acts of 1842 was thus amended by chapter eighteen of Acts of 1881, the mode of instituting proceedings in the circuit court according to chapter forty-two of the Code became substantially the same as by the writ of *ad quod damnum*. And hence the conclusion I have reached, that these proceedings in the circuit court were intended as a substitute for the writ of *ad quod damnum* in the county court, is made still more certain; for the Legislature would hardly have intended, that two

modes of ascertaining this just compensation should exist at the same time, when they were substantially the same, the one being by a jury of twelve freeholders in the circuit court, and the other by a jury of twelve freeholders in the county court. And it is rendered still more improbable that this could have been the Legislative intent, when it is, to say the least, very doubtful whether under our Constitution as amended a writ of *ad quod damnum* could be issued by the county court, or a jury of twelve freeholders sit in that court.

There is therefore no weight in the argument of the counsel for the plaintiff in error, that as the writ of *ad quod damnum* was an ancient common law remedy, which had long been used, it ought not to be supposed to be abolished by chapter fourteen of Acts of 1881, unless its abolition was expressly declared; for what is substantially the same has been substituted for it. The county court therefore did not err in refusing to award a writ of *ad quod damnum* to the plaintiffs in error, and in ordering proceedings to be instituted and prosecuted in its name in the circuit court of Hancock county. These proceedings in the circuit court were regular and proper. The tenants having excepted to the report of the commissioners were allowed a jury of twelve freeholders according to law, who returned their verdict; and a judgment was rendered pursuant to this verdict, and on its return to the county court of Hancock that court established the road and made the proper order for the payment of the damages and the costs in both the circuit court and county court. The jurisdiction of the county court to establish this road was disputed in the county court; first, because that court did not, as required by section thirty-five of chapter fourteen of Acts of 1881, "appoint two or more viewers or a committee of their body to view the ground and make report;" but on June 6, 1881, said court in violation of law appointed all three members of the court a committee to make the view, it being supposed to be absurd, that the three members of the court should as a court instruct itself as a committee, or that the three members of the committee should report to the court which consists of the same three members. This does not strike me as an absurdity. If the court instructs the committee, the in-

structions are made a part of the record of the court; and
thus on an appeal the circuit court would have a correct
mode of knowing the views of the county court, which it is
reviewing. Nor do I see any absurdity in the three persons,
who are members of the court, reporting as a committee to
the court in its corporate capacity; for in contemplation of
law the county court as a corporate body is a body distinct
from the several persons individually, who may happen to
constitute the court. From the earliest day three viewers
could be appointed to view a road; and indeed originally
the county court could not appoint less than three persons as
viewers. (R. C. of Va. of 1819, chap. 236, sec. 1.) It is true,
that the Code of West Virginia, chapter forty-three, section ·
thirty-five, allowed the board of supervisors to appoint two
or more viewers or a committee of its own body to
view a proposed road. Under this provision either three
viewers or a committee composed of three supervisors might
be appointed. After the county court had been substituted
as the authority to establish county roads, that court was
still authorized to appoint two or more viewers · or a com-
mittee of their own body to view the proposed road. (Chap-
ter 194, section 35 Acts of 1872–3; chapter 14, section 35,
Acts of 1881.) As from the earliest period three persons
might and usually did act as viewers of a public road, it seems
that there is nothing in the last two acts, to which we have re-
ferred, to indicate that this long-established practice was in-
tended to be overthrown. In authorizing a committee of its
own body to act as viewers, doubtless the law intended, that
two of its members might be appointed such committee, just
as the law authorized two others to be appointed such com-
mittee; but as three others could always have been appointed
such viewers, I see no ground for questioning the authority
of the county court as a corporate body to appoint all three
individuals constituting the court a committee to act as such
viewers. I see nothing in either the wording or the spirit
of the law requiring any other construction of the statute.

Again it is objected, that the county court of Hancock
had no jurisdiction to establish this road, because the com-
mittee appointed to view the ground never made a sufficient
report. The order made by the county court of Hancock

recites at full length and in detail all that was done by this committee consisting of the members of the court. So full are these recitals, that, if what is contained in them had been reduced to writing and signed by the three members of the committee, who were the members of the court, there could have been no question but this would have been a sufficient report. Now there is nothing in section thirty-five of chapter fourteen of Acts of 1881, which requires this report to be reduced to writing and signed by the members of the committee making the report. This is the most proper mode of making their report. Their signitures to it however are only desirable in order to identify the report as theirs. If the report is spread, as it was in this case, on the record-book of the county court and is then identified by the signature of the president of the court for and on behalf of the whole court, the contents of the report as well as its complete identification seem to have been as well established, as if the report had been formally reduced to writing as a report and signed by all the members of the committee. This irregularity therefore does not seem to me to be such, as ought to vitiate the proceedings in this case.

It is said that this order, in which the contents of this report was thus set out at length, was set aside at a subsequent court, and another order, which did not so fully recite the action of this committee, was substituted in its place; and therefore we should consider this case, just as if this order of August 23, 1881, containing the full recitals had never been made. Of course we must regard this order as no longer operative as an order, after it was set aside; but, as on the face of the order setting it aside it appears not to have been set aside, because the facts stated in it as the action of the committee were in any respect incorrect, I can see no reason, why this Court as well as the county court might not well consider these recitals in this order as the report of this committee, though it had ceased to be operative as an order of the court in its corporate capacity. There can be no question, that under our statute, if the county court is bound to pay to a proprietor of the land taken a just compensation in money, it can not compel such party to receive any part of his compensation in anything other than money, as for

instance the building by the county of additional fencing along the road. (*Chesapeake and Ohio Railroad Company* v. *Patton*, 6 W. Va. 147; *Railroad Company* v. *Halstead*, 7 W. Va. 301.

It is claimed, that the true spirit of the law as laid down in these cases was violated by the concluding part of the order made by the county court of Hancock on June 5, 1882, which was : " And it further appearing to the court, that the said defendants claim damages amounting to $500.00, and this court being willing to give only $25.00 and water-privileges, which offer the defendants refused to accept, it is hereby ordered, that proceedings be instituted and prosecuted in the circuit court of Hancock county pursuant to law to ascertain what will be a just compensation to the aforesaid proprietors or tenants, if any, for the lands proposed to be taken." Two bills of exceptions were taken to this order, but no specific objection was made to the offer of the county court, that it was not all in money but partly in money *and partly in water-privileges.* The record fails to show what was meant by water-privileges, or that, had this offer been accepted, these defendants would have received any water-privileges, which they would not have had in any event. But regarding this as an improper manner, in which to offer compensation, and that the offer should have been made in money only, still I am unable to see, that in view of the proceedings taken subsequently these defendants can be regarded as having been prejudiced by the fact that the offer was made in this form. The statute, section thirty-seven of chapter fourteen of Acts 1881, provides :

" At any time, if the court have enough before them to enable them to ascertain what would be a just compensation to the proprietors or tenants, and such proprietors or tenants to accept what the court deems just, the said court upon such acceptance being reduced to writing and signed by the proprietors and tenants may determine to undertake the work."

Now suppose, that the court in making this offer of a just compensation should include in it something besides money as, for instance, the building of two fences one along each side of the road. This might be improper on the part of the court ; but if the offers were made in writing and accepted

in writing by the proprietors and tenants, and the road should be opened by the court, and the fences built, could these proprietors then complain, that such road had been illegally established? It seems to me, they could not. They were not compelled to accept their compensation in anything other than money, but having done so they would be thereby estopped from complaining, and the cases we have cited would become entirely inapplicable.

. But it is said, that they refused this offer of compensation made to them by the county court of Hancock. This they had a right to do; and in such case, section 38 of the said chapter provides: "If the compensation to be paid to any proprietor or tenant be fixed by agreement, the county court shall order proceedings to be instituted and prosecuted in its corporate name in the circuit court of the county pursuant to the forty-second chapter of this Code." This is just what the county court did; and the contingency, on which it had a right to do it, had arisen, that is, the compensation to be paid had not been fixed by agreement. On the contrary it appears, that the offer made by the county court had been expressly refused. The right therefore to institute these proceedings in the circuit court existed, whether their failure to agree with the tenants arose from a disagreement as to what was a just compensation in money or from the fact, that part of the compensation was, as is supposed, offered in *water-privileges.* If ultimately the tenants get more than the *offer in money,* excluding entirely their *water-privileges,* they will be entitled to their costs; and thus an offer in this form might prejudice the county court but it could not prejudice the tenant or proprietor. They got in this case their costs in the circuit court as well as in the county court and their just compensation exclusively in money as assessed by a jury of twelve freeholders on their demand. They have no ground then in this court to complain of the form, in which the county court made its offer of compensation.

It is claimed by the counsel for the plaintiffs, that whenever private property of an individual is to be divested by proceedings against his will, there must be a strict compliance with all the provisions of law, which are made for his protection and benefit. This is true, and if these provisions for

the protection and benefit of the land-owner are not strictly complied with, the proceedings will be ineffectual to divest the land-owner's title. They are not only conditions precedent, which must be complied with, before the land-owner's property can be disturbed; but the party seeking to divest him of his right of property against his will must show affirmatively such compliance with these conditions. (_Adams_ v. _Clarksburg_, 23 W. Va. 207). It is claimed, that there was no such compliance with these conditions precedent, before this public road was established and the plaintiffs in error deprived of the use of their land against their consent. Is this true? The thirty-sixth section of chapter fourteen of Acts of 1881, page 163, provides "That the county court shall appoint a day for the hearing of the parties interested, and cause notice thereof to be given to the proprietors and tenants of the property which would have to be taken or injured to show cause against the same." From the very wording of this section it is apparent, that the owner of land is entitled to this notice before judgment appropriating his land can be entered and the road established. Indeed the constitutional right of the legislature to pass a statute authorizing the appropriation of private property for public uses by an _ex parte_ proceeding without notice and against the consent of the owner might well be sustained. (See _The Baltimore & Ohio Rail Road Co._ v. _The Pittsburg, Wheeling & Kentucky Rail Road Co._ 17 W. Va. 633–4.) But our legislature has attempted nothing of the kind.

In this case the county court on December 7, 1881, pursuant to the above statute made an order fixing the 17th day of December for the hearing of the parties interested; but it did not order all the parties interested to be notified in the manner prescribed by law. It is true, that the order made on the 17th day of December recited, that certain parties named were summoned to show cause against the establishment of this road, and two of the parties thus summoned appeared and consented to the establishment of this road. But the third party recited to have been summoned set up no claim to damages and made no defence to the establishment of the road but did file an answer denying, that the court had jurisdiction to establish this road as a public road.

The court ordered proceedings to be instituted and prosecuted in the circuit court to ascertain what would be a just compensation to this party, and afterwards on November 4, 1882, ordered this road to be established without giving any notice to show cause against its establishment in the manner prescribed by law.    However irregular these proceedings up to that time may have been, they were subsequently made regular; as the circuit court on appeal reversed the proceedings of the county court and by its order of March 30, 1882, aeclared, " that there is error in the proceedings of the county court in the matter of the establisment of said public road in the failure of the county court to appoint a day for the hearing and to cause notice to be given to the petitioners as proprietors of the property to be taken or injured to show cause against the same and for other errors upon the record appearing."    Thereupon the circuit court remanded the case to the county court of Hancock with directions, that the said county court appoint a day for hearing and cause notice to be given to the appellants as proprietors of the property to be taken or injured to show cause, if any they have, against the establishment of the proposed road.    When the case was returned to the county court, it did make the order, which it was instructed to make, on May 8, 1882, fixing the first day of the next June term of the court as the day for said hearing and ordering all the necessary and proper parties, naming them, to be summoned to show cause, if any they had, why this proposed road should not be established.    They were all of them accordingly duly and legally summoned and on the return day, June 5, 1882, did show cause against the establisment of this road.

They claimed among other things $500.00 as their just compensation, while the court was willing to give them only $25.00 and water-privileges.    This offer of the court they refused to accept; and thereupon the court ordered proceedings to be instituted and prosecuted in the circuit court of Hancock county in the name of the county court of Hancock county to ascertain what would be a just compensation to them for the lands proposed to be taken and other damages. We have already seen, that there was no irregularity or error in the order, of which the plaintiffs in error have a right to

complain in this court. By the proceedings in the circuit court the just compensation of these plaintiffs in error was found to be $76.00; and they were adjudged their costs in the circuit court. On the return of the case to the county court of Hancock the plaintiffs in error moved the court to abandon the proposed undertaking, which the court by its order of September 3, 1883, refused to do, and adjudged, that they recover of the petitioners for this road their costs and adjudged against the county court of Hancock in favor of these plaintiffs in error the $76.00 ascertained in the circuit court to be their just compensation and gave an order on the county-treasury for the amount. After the payment of all the costs in both courts and this $76.00 the proper road-surveyor was directed to take charge of said road and open the same as a public road. In all these proceedings after the return of the said case to the county court of Hancock county from the circuit court I can see no error prejudicial to the plaintiffs in error. The order of September 3, 1883 was the order establishing the road; it was made after notice had been given to the tenants to show cause against the establishment of the road on the first day of the June term 1882, after cause had been shown against it after the regular and proper ascertainment of the just compensation of all the proprietors of lands, who claimed any damages, which ascertainment was properly made in the circuit court, and after a compliance with all the provisions of the statute-law made for the protection and benefit of the proprietors of the lands taken.

It is claimed that the road established by these proceedings is not defined with necessary accuracy, and that its location is not shown by the record with reasonable certainty. There is nothing, it seems to me, in this objection. There is no difficulty in ascertaining from the record the exact location of the road.

The judgment of the circuit court of Hancock county rendered June 25, 1884, affirming the proceedings aforesaid and affirming the judgment of the county court of Hancock county must for these reasons be affirmed; and the defendant in error, the county court of Hancock county, must recover of the plaintiffs in error its costs in this court expended and $30.00 damages.

AFFIRMED.